Filed 1/25/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERNESTO RODRIGUEZ ORELLANA,<br><br>    Defendant and Appellant.</td><td>H048315<br>(Monterey County<br> Super. Ct. No. 19CR007735)</td></tr>
</table>

Ernesto Rodriguez Orellana was charged with criminal threats. The trial court found a doubt as to Orellana's competency and suspended criminal proceedings. Orellana was treated at Patton State Hospital. He regained competence following treatment, and the parties entered into a plea agreement in which Orellana agreed to serve a prison term of two years. The trial court subsequently imposed a sentence consistent with the terms of the plea agreement.

On appeal, Orellana contends the trial court's failure at sentencing to award him conduct credit for the period of time in which he was receiving treatment for restoration to competence in the state hospital violates Senate Bill No. 317 (2021–2022 Reg. Sess.) (Senate Bill 317). Orellana maintains that Senate Bill 317, which was enacted in October 2021 while his appeal was pending in this court and provides for such credits, retroactively applies to his case. He further argues that denial of conduct credits violates his right to equal protection of the law. The Attorney General asserts Orellana waived his

appellate rights in the plea agreement, Senate Bill 317 does not apply, and he is not entitled to conduct credit based on principles of equal protection.

As explained below, we conclude Orellana's appellate waiver is invalid and does not bar this appeal. Nevertheless, based on the California Supreme Court's decision in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*), we decide that Senate Bill 317 does not apply retroactively and the trial court's denial of conduct credit for the time Orellana was committed to the state hospital does not violate equal protection principles. Consequently, we affirm the judgment.

## I. PROCEDURAL BACKGROUND[1]

In July 2019, the Monterey County District Attorney charged Orellana by felony complaint with two counts of criminal threats (Pen. Code, § 422, subd. (a)[2]; counts 1 & 2) and one misdemeanor count of exhibiting a deadly weapon (§ 417, subd. (a)(1); count 3) and alleged a prior prison term enhancement (former § 667.5, subd. (b)) as to the felony conviction. Orellana pleaded not guilty and denied the prior prison term allegation.

On July 30, 2019, after Orellana's arraignment, defense counsel expressed doubt as to Orellana's competence under section 1368. The trial court found that a doubt had arisen as to Orellana's mental competence, referred Orellana for examination, and suspended the proceedings. The court ordered that Orellana remain in custody.

Pursuant to section 1370, Orellana was committed to the state hospital on August 27, 2019, and admitted there on December 6, 2019. On January 27, 2020, the Department of State Hospitals (DSH) filed a certificate of restoration to competence pursuant to section 1372 and, on January 30, 2020, the trial court held a hearing on Orellana's restoration. The trial court found Orellana's competence restored and reinstated the criminal proceedings. The court ordered Orellana to remain in custody without bail. Whether Orellana should receive conduct credits for the 48 days in which

---

[1] The facts of Orellana's offenses are not relevant to the issues in this appeal.
[2] Unspecified statutory references are to the Penal Code.

2

he was being treated for restoration to competence at the state hospital is the central question at issue in this appeal.[3]

On May 26, 2020, the parties reached a negotiated disposition. Under the plea agreement, which was not reduced to writing, the prosecution moved to orally amend the complaint to add charges for felony false imprisonment (§ 236; count 4) and misdemeanor criminal threats (§ 422, subd. (a); count 5). Orellana agreed to plead no contest to the two new charges in exchange for a prison sentence of two years on the felony conviction, to be served in county jail, a concurrent county jail term of no more than 180 days on the misdemeanor conviction, and a dismissal of the remaining charges and prior prison term enhancement allegation. The trial court granted the oral motion to amend the complaint. After reviewing with Orellana the potential immigration consequences of his plea and confirming his waiver of constitutional rights to a preliminary hearing, jury trial, confrontation and cross-examination of witnesses, and appeal, as well as the factual basis for the pleas, the trial court accepted Orellana's pleas of no contest to counts 4 and 5. The court found that Orellana had knowingly, freely, voluntarily, and intelligently waived his rights.

After entry of the plea and prior to sentencing, defense counsel filed a motion requesting that the trial court grant conduct credits for the time Orellana spent in treatment to restore competence at the state hospital, or alternatively for the time spent in state hospital custody once competent but before being transported. Orellana's motion asserted that equal protection principles required the court to award conduct credits under

---

[3] The record reflects that Orellana was transported to the state hospital on December 5, 2019, and transported back from the hospital on January 29, 2020, for a total of 56 days at the state hospital. As noted *post*, at sentencing, the trial court granted Orellana conduct credit from the date he was certified as competent (January 23, 2020, though the certificate was filed on January 27, 2020) until transportation back from the hospital. Accordingly, on appeal, Orellana contends he is entitled to 48 days of conduct credit, representing the time he spent undergoing treatment to restore his competence, namely, from December 6, 2019, through January 23, 2020.

section 4019, subdivision (a)(8),[4] because persons receiving competency treatment in state hospital programs were similarly situated to those receiving treatment in county jail competency programs, and no compelling interest justified disparate treatment. The prosecution filed written opposition to the motion, arguing that the plain language of section 4019, subdivision (a)(8) entitles only defendants in county jail treatment facilities to conduct credit. The prosecution asserted that persons undergoing competency treatment as patients in a state hospital setting were not similarly situated to inmates undergoing treatment in the penal or correctional setting of county jail facilities, justifying the differential access to conduct credit. The prosecution nevertheless agreed that Orellana was entitled to conduct credits for the interim period following his restoration to competence and before his transportation back to the county jail.

The trial court heard argument on the motion for conduct credits at the sentencing hearing on July 16, 2020. The court rejected Orellana's equal protection argument but agreed that he was statutorily entitled to conduct credits from the date he was certified as restored to competence. The court sentenced Orellana in accordance with the plea agreement. It imposed the two-year prison term to be served in county jail (§ 1170, subd. (h)) and dismissed the remaining charges. The court awarded Orellana 367 days of actual

---

[4] Section 4019 allows specified categories of defendants held in local custody or other settings the opportunity to earn presentence credit, commonly referred to as "conduct credit," against their sentences for good behavior and work performed.

At the time of Orellana's sentencing in 2020, and as relevant to his motion for conduct credits, section 4019, subdivision (a)(8) authorized conduct credits for persons undergoing competency treatment while "confined in or committed to a county jail treatment facility . . . ." This provision of section 4019 was enacted in 2018 as part of Senate Bill No. 1187 (2017-2018 Reg. Sess.). Later, during the pendency of this appeal and with the recent passage of Senate Bill 317, the Legislature amended section 4019, subdivision (a)(8) to apply to persons undergoing competency treatment while "confined in or committed to a state hospital or other mental health treatment facility, or to a county jail treatment facility . . . ." We examine the history of these conduct credit provisions and their application to Orellana's case in our discussion, *post*.

4

custody credit and 318 days of conduct credit, for a total of 685 days of credit for time served.

Orellana filed a timely notice of appeal based on the sentence or other matters occurring after the plea that do not affect the validity of the plea (Cal. Rules of Court, rule 8.304(b)), noting specifically the conduct credits issue and appellate waiver. The trial court granted a certificate of probable cause.

## II. DISCUSSION

Orellana contends that Senate Bill 317 applies to his matter and the equal protection clauses of the state and federal constitutions entitle him to an additional 48 days of conduct credit for his treatment time in the state hospital. Before addressing these questions, we examine the effect of the oral appellate waiver, as it is potentially dispositive.

### A. Appellate Waiver

The Attorney General asserts that Orellana's claim is not reviewable because he waived the right to appeal when he pleaded no contest to the felony false imprisonment and misdemeanor criminal threat charges. Orellana contends the appeal is cognizable.

### 1. Legal Principles and Standard of Review

It is well settled that an express waiver of the right to appeal in a negotiated plea agreement is valid and enforceable, provided that the waiver is knowing, intelligent, and voluntary. (*People v. Cisneros-Ramirez* (2018) 29 Cal.App.5th 393, 399–400 (*Cisneros-Ramirez*); see *People v. Castellanos* (2020) 51 Cal.App.5th 267, 278 (conc. & dis. opn. of Danner, J.) (*Castellanos*); *People v. Vargas* (1993) 13 Cal.App.4th 1653, 1659 (*Vargas*).) "Just as a defendant may affirmatively waive constitutional rights to a jury trial, to confront and cross-examine witnesses, to the privilege against self-incrimination, and to counsel as a consequence of a negotiated plea agreement, so also may a defendant waive the right to appeal as part of the agreement." (*People v. Panizzon* (1996) 13 Cal.4th 68, 80 (*Panizzon*).) The form of the waiver, which "may be manifested either orally or in

5

writing" (*ibid.*) is not determinative.  Rather, a valid and enforceable waiver of the right to appeal depends on the defendant having entered into the waiver knowingly, intelligently, and voluntarily.  (*Ibid.*)

Deciding whether there has been a knowing, intelligent, and voluntary waiver requires courts to examine " 'the particular facts and circumstances surrounding that case, including the background, experience, and the conduct of the accused.' " (*Vargas*, *supra*, 13 Cal.App.4th at p. 1662, quoting *Johnson v. Zerbst* (1938) 304 U.S. 458, 464.)  The waiver's validity "is to be ascertained by reference to the totality of the relevant circumstances." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 189, fn. 18 (*Sivongxxay*).)  Indeed, " 'the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully underst[ood] the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not [have] know[n] the *specific detailed* consequences of invoking it.' " (*Ibid.*, quoting *United States v. Ruiz* (2002) 536 U.S. 622, 629.)  A valid waiver thus presupposes the "intelligent, and intentional relinquishment of a known right or privilege." (*Castellanos*, *supra*, 51 Cal.App.5th at p. 272; see *Edwards v. Arizona* (1981) 451 U.S. 477, 482; *Johnson v. Zerbst*, at p. 464; *City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107–108.)

"The voluntariness of a waiver is a question of law which appellate courts review de novo." (*Panizzon*, *supra*, 13 Cal.4th at p. 80.)  The burden is on the party claiming the existence of the waiver to prove it by evidence that does not leave the matter to speculation.  (*Vargas*, *supra*, 13 Cal.App.4th at p. 1662; *Castellanos*, *supra*, 51 Cal.App.5th at p. 272.)

### 2. Forfeiture

We dispose at the outset with Orellana's assertion that the People in this case forfeited any argument on appeal concerning the appellate waiver by failing to oppose Orellana's request for conduct credit in the trial court on that basis.  Orellana argues that because the prosecution contested his motion for conduct credit on the merits without

reference to the appellate waiver, it is precluded from raising the claim on appeal. While it is true that failure to raise an objection in the trial court can result in forfeiture of that claim on appeal, the doctrine is not absolute and we are "generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) As discussed in detail below, the oral appellate waiver purported to waive Orellana's "right to appeal the conviction, judgment and any other orders previously issued" by the trial court. Orellana made his equal protection claim in support of his request for conduct credit in a written motion filed before his sentencing hearing; at that time, the court had not imposed sentence or entered judgment. Accordingly, the prosecution had no basis at that time to assert waiver as a defense to Orellana's request for conduct credit, and therefore the forfeiture doctrine does not apply.

### 3. Plea Agreement Terms

We next consider Orellana's argument that his putative waiver of appellate rights was not valid or enforceable. Whether the appellate waiver extends to the issue on appeal and represents a bargained-for term of the negotiated plea agreement requires us to examine the terms of the plea agreement and waiver. As noted *ante*, we look to the totality of the circumstances pertaining to any waiver of the statutory right to appeal. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 189, fn. 18.)

As there was no written plea agreement nor signed waivers, the record of the plea agreement and related waivers is contained entirely in the transcript of the plea hearing on May 26, 2020.

At the hearing, the trial court first obtained the parties' consent to remote appearances by videoconference (due to the COVID-19 pandemic) and reviewed the proposed amendment to the charges and the agreed-upon disposition with Orellana and counsel for both sides. The trial court set forth the parties' agreement as follows. "[M]y understanding is that, Mr. Orellana, you're prepared to enter no contest pleas to the newly

added Count 4 and Count 5. The understanding would be that you're entering the no-contest pleas in return for a stipulated or agreed-upon sentence of two years, the middle term, as to Count 4. That is a sentence that you would serve in the county jail, pursuant to Penal Code Section 1170[, subd.] (h). [¶] As to Count 5, the understanding is that you would receive no more than 180 days to be served locally in the county jail, and that's [con]current with the sentence imposed in Count 4. [¶] The further understanding is that as a result of your no contest pleas, the People are going to dismiss the case[] ending in 298 . . . . [¶] Is that the understanding that was reached here between the parties, Ms. Schwartz [prosecutor]?"

The prosecutor and defense counsel each confirmed that the trial court's understanding as articulated on the record was correct. The trial court then addressed Orellana in the following colloquy. "THE COURT: Mr. Orellana, is that your understanding of what's going to happen with your cases? [¶] THE DEFENDANT: Yes. [¶] THE COURT: And are those the terms and conditions upon which you're willing to plead no contest to? [¶] THE DEFENDANT: [¶] Yes. [¶] THE COURT: Has anyone made any promises to you other than what was just said in open court? [¶] THE DEFENDANT: No." During this exchange with Orellana, the court did not reference as a term of the plea agreement any appellate waiver.

After ascertaining that Orellana's change of plea was voluntary and that he understood the potential immigration consequences, the trial court conducted voir dire regarding Orellana's waiver of constitutional rights. That colloquy, which we examine more closely in our discussion of the validity of the appellate waiver, *post*, included the following exchange. "THE COURT: It's my understanding that you're giving up the right to appeal the conviction, judgment and any other orders previously issued by this Court. Is that correct? [¶] THE DEFENDANT: Yes. [¶] THE COURT: Do you give up your federal and state right to appeal in this matter? THE DEFENDANT: Yes."

8

The trial court then summarized the maximum possible jail terms for counts 4 and 5, to which Orellana had agreed to plead, restitution, and the right to withdraw the plea at sentencing if the sentencing judge did not agree with the terms. The court asked Orellana, "Do you have any questions that you would like to ask your attorney or the Court before you enter your plea?" Orellana responded, "No, that's fine the way it is, that's perfect." After giving counsel for both sides an opportunity to place on the record "any other admonitions or consequences applicable," the court took Orellana's pleas of no contest to counts 4 and 5. Orellana's counsel joined in the waiver and the pleas and stated the factual basis for the pleas.

### 4. Validity of the Appellate Waiver

In order for us to consider on appeal his challenge to the trial court's calculation of credits, Orellana must demonstrate either that (1) the issue on appeal concerning conduct credit falls outside the scope of the appellate waiver, or (2) the waiver is invalid. (See *People v. Becerra* (2019) 32 Cal.App.5th 178, 192 (*Becerra*).) For the reasons explained below, we conclude that under the particular facts of this case the waiver is invalid and does not bar our consideration of Orellana's substantive claims on appeal.

In analyzing validity, we take guidance from our Supreme Court's decision in *Panizzon*, *supra*, 13 Cal.4th 68. *Panizzon* involved a defendant's attempt to appeal a sentence that was agreed to as part of a negotiated plea deal. The high court interpreted the defendant's challenge to his agreed-upon sentence to be an attack on the validity of the plea agreement and held that the claim was not reviewable absent a certificate of probable cause.[5] (*Panizzon*, at pp. 78–79.) The court explained that even if it were to assume the defendant's claim did not require a certificate of probable cause, the claim on

_____

[5] Under section 1237.5 and California Rules of Court, rule 8.304(b)(1), (4), the reviewing court will not consider any issue on appeal affecting the validity of a no contest plea unless the defendant has obtained a certificate of probable cause. (See *People v. Espinoza* (2018) 22 Cal.App.5th 794, 803.)

9

appeal would not be reviewable because the terms of the waiver of appellate rights "specifically extended to any right to appeal" the negotiated sentence. (*Id.* at p. 86.) The Supreme Court rejected the defendant's argument that he had not been properly admonished regarding his waiver of the right to appeal, reasoning that even without a specific admonishment by the trial court, the written waiver and in-court-questioning of the defendant and counsel raised no doubts that the defendant understood his rights and the consequences of his no contest plea. (*Id.* at pp. 83–84.)

Courts since *Panizzon* have operated with the understanding that "[a]bsent something in the record raising a doubt [the] defendant understood and knowingly waived his appeal rights, a written waiver of those rights by [the] defendant, coupled with [the] defendant's and his attorney's attestations to the court that [the] defendant understood and voluntarily relinquished each right, is sufficient to establish a defendant's waiver of his right to appeal was knowingly, voluntarily, and intelligently made." (*Cisneros-Ramirez*, *supra*, 29 Cal.App.5th at p. 400, citing *Panizzon*, *supra*, 13 Cal.4th at pp. 83–84.)

Orellana submits that this case raises such a doubt because the record shows the appellate waiver was not part of the agreement negotiated by the parties but instead was a separate condition unilaterally imposed by the trial court. He points out that in reviewing the agreed-upon terms of the plea change with the parties and verifying "those [are] the terms and conditions upon which you're willing to plead no contest," there was no mention of an appellate waiver. Only later in the proceeding did the court raise the waiver of appellate rights and state its "understanding" that Orellana was agreeing to give up those rights. Orellana likens this appellate waiver to "judicial plea bargaining" and argues that the court effectively imposed a condition on the defendant apart from the "give and take" agreed to by the parties during plea negotiations.

The Attorney General disputes this characterization and argues the record confirms the validity of the appellate waiver. According to the Attorney General, the trial

court's omission of the appellate waiver from its recitation of the terms and conditions of the plea agreement was "obviously an oversight," and if the trial court had sought to impose a term of waiver that was not part of the plea-bargained agreement between the defense and the prosecution, Orellana (or at least his counsel) would have objected. The Attorney General notes that after the trial court articulated its understanding of the appellate waiver on the record, Orellana confirmed it was correct, and furthermore that neither Orellana nor his defense counsel disagreed with the waiver terms when the trial court invited questions or additional admonitions.

The parties appear to agree that to be valid, Orellana's waiver of the right to appeal must be a term of the bargained-for agreement between the prosecution and the defense. Indeed, "[a]ppellate waivers *contained within plea agreements* are generally enforceable." (*Becerra*, *supra*, 32 Cal.App.5th at p. 186, italics added; see *Panizzon*, *supra*, 13 Cal.4th at p. 80 [reiterating that defendants may waive the right to appeal "as a consequence of a negotiated plea agreement"].) The bargained-for requirement relates closely to the predicate that a valid waiver comprises the "intelligent, and intentional relinquishment of a known right or privilege." (*Castellanos*, *supra*, 51 Cal.App.5th at p. 272.)

The analysis in *Panizzon* is illustrative. In ascertaining whether the defendant's waiver of the right to appeal was valid, the Supreme Court reviewed the record to determine whether the defendant had been properly informed of his rights and the consequences of his no contest plea. (*Panizzon*, *supra*, 13 Cal.4th at p. 83.) The court noted that even in the absence of an admonishment by the trial court regarding the right to appeal, "the waiver and plea agreement signed by [the] defendant and his attorney contains defendant's representations . . . that he had discussed with his attorney both the paragraph specifying the sentence to be imposed and the paragraph containing the waiver of the right to appeal the sentence, and that he fully understood all matters set forth in the document without exception." (*Id.* at p. 84.) The court additionally noted that the written

11

waiver and plea agreement reflected the defense counsel's representation "that he personally went over the document with [the] defendant and concurred in [his] decision to waive the rights specified in the document," as well as the fact that at the in-court hearing, the defendant and his attorney both "attested to the document's valid execution" and responded to the court's questions, raising "no doubts as to [the] defendant's understanding of his rights and the consequences of his no contest plea." (*Ibid.*) Our high court viewed this record as demonstrating an enforceable waiver of the right to appeal the sentence. (*Ibid.*)

The plea agreement and waiver of the defendant's right to appeal in *Panizzon* included several safeguards that—by comparison—are absent from the record in this case. Most notably, we proceed in our independent review of the record without the benefit of any written plea agreement or signed appellate waiver. The trial court's oral statement summarizing its understanding of the appellate waiver and obtaining Orellana's on-the-record assent thereto represents the totality of information regarding any discussion of or negotiations to include a waiver of the right to appeal in the plea agreement. The oral appellate waiver stands in contrast with the extensive written documentation and confirmatory on-the-record verification of the waiver in *Panizzon*, *supra*, 13 Cal.4th at page 84. Like *Panizzon*, other reported cases involving a valid and enforceable appellate waiver present a more robust record showing the waiver to be part of the plea agreement. (See, e.g., *Becerra*, *supra*, 32 Cal.App.5th at p. 188 [noting the valid and enforceable appellate waiver was part of the defendant's written plea agreement]; *Cisneros-Ramirez*, *supra*, 29 Cal.App.5th at p. 401 [noting the defendant's appellate waivers, which he initialed and signed as part of the guilty plea form, were "articulated in terms that [we]re neither vague nor limited"].)

Although a written plea agreement is not required to establish an enforceable waiver, its absence under the circumstances of this case undermines any conclusion that the appellate waiver was indeed a fully informed, bargained-for term of the plea

agreement. We decline to draw that inference where, as here, the support in the record for the waiver of the right to appeal is limited to a short, oral colloquy between the defendant and the judge *after* the judge had already set forth the "terms and conditions upon which [Orellana was] willing to plead no contest to." While it is true that the trial court thereafter invited Orellana to ask questions or state any concerns to the trial court or his counsel, Orellana's failure to do so does not affirmatively demonstrate a knowing and intelligent relinquishment of the right.

In making this determination, we are mindful that the burden is on the party seeking to enforce the waiver to prove it was clearly established by evidence in the record. (*Castellanos*, *supra*, 51 Cal.App.5th at p. 272.) "[D]oubtful cases will be resolved against a waiver." (*Vargas*, *supra*, 13 Cal.App.4th at p. 1662.) We conclude that the record in this case falls short of establishing the validity and enforceability of Orellana's appellate waiver.[6] We therefore consider his appeal from the trial court's sentencing order rejecting his equal protection claim to additional conduct credit.

### B. Conduct Credit

As he did in the trial court, Orellana contends he is entitled to an award of conduct credit under section 4019 for the time he spent undergoing treatment for restoration to competence in the state hospital both as a matter of statutory and equal protection principles. Orellana bases his arguments on Senate Bill No. 1187 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1008, §§ 1–6) (Senate Bill 1187) and Senate Bill 317, which extended the conduct credit provisions of section 4019 to pretrial detainees undergoing treatment for restoration to competence. Before examining the merits of these issues, we set out the statutory background.

---

[6] Having decided the appellate waiver is not enforceable, we need not address Orellana's alternative argument that the miscalculation of conduct credit constitutes an "unauthorized sentence" that may be corrected at any time, notwithstanding the appellate waiver.

13

### 1. Conduct Credit Eligibility During Treatment for Incompetence

Section 4019 provides defendants held in local custody or other specified settings prior to sentencing "the opportunity to earn 'conduct credit' against their sentences for good behavior. Conduct credits encourage prisoners to conform to prison regulations, to refrain from criminal and assaultive conduct, and to participate in work and other rehabilitative activities." (*Brown*, *supra*, 54 Cal.4th at p. 317.) Section 4019 "specifies multiple categories of detainees who are eligible to earn such credits." (*People v. Yanez* (2019) 42 Cal.App.5th 91, 96 (*Yanez*).)

Historically—that is, prior to the recent legislative changes discussed herein— section 4019 did not award conduct credit to detainees for time spent in nonpenal institutions like state hospitals. (See, e.g., *People v. Callahan* (2006) 144 Cal.App.4th 678, 686.) As expressed by the California Supreme Court in *People v. Waterman*, the "criminal-incompetence statute [in effect at the time] does not expressly allow such conduct credit." (*People v. Waterman* (1986) 42 Cal.3d 565, 569 (*Waterman*).)

In *Waterman*, the California Supreme Court rejected an equal protection challenge to the denial of section 4019 credits to individuals undergoing restoration to competence. It reasoned, "The goal of treatment for incompetence seems particularly inconsistent with an incentive-credit system during therapy. The purpose of confinement is to restore the mental ability to stand trial . . . that goal would be hindered if mere institutional good behavior and participation automatically reduced the therapy period." (*Waterman*, *supra*, 42 Cal.3d at p. 570.)

Effective January 1, 2019, the Legislature in Senate Bill 1187 rejected in part this view by modifying the statutory framework governing conduct credit eligibility during incompetency treatment by amending sections 1375.5 and 4019 to authorize conduct credits for persons receiving treatment in county jail facilities. Section 1375.5, as part of the statutory scheme governing mental competence of a defendant to stand trial, addresses the issue of credit for time spent by a defendant in a hospital or other facility

14

due to a commitment for mental incompetence. As amended, section 1375.5, subdivision (c) states that "[a] person subject to this chapter shall receive credits pursuant to Section 4019 for all time during which he or she is confined in a county jail and for which he or she is otherwise eligible." (§ 1375.5, subds. (a), (c), as amended by Stats. 2018, Ch. 1008, § 4.)

Of particular relevance here, the amendment to section 4019 matched these changes by defining a new eligibility category for presentence conduct credit as set forth in subdivision (a)(8), "[w]hen a prisoner is confined in or committed to a county jail treatment facility, as defined in Section 1369.1, in proceedings pursuant to Chapter 6 (commencing with Section 1367) of Title 10 of Part 2." (§ 4019, subd. (a)(8), as amended by Stats. 2018, Ch. 1008, § 5.) Senate Bill 1187 thus expanded conduct credit eligibility to persons receiving competency treatment while confined in or committed to a county jail facility, but it made no changes with respect to persons (such as Orellana) receiving treatment in a state hospital facility.

In October 2021, while Orellana's appeal was pending in this court but after he had been restored to competence and been sentenced, the Legislature passed Senate Bill 317, which, *inter alia*, further amended section 4019 and took effect on January 1, 2022. Senate Bill 317 modified section 4019, subdivision (a)(8) (previously added by Senate Bill 1187) to expand eligibility for presentence conduct credit "[w]hen a prisoner is confined in or committed to *a state hospital* or other mental health treatment facility, *or to a county jail treatment facility*, as defined in Section 1369.1, in proceedings pursuant to Chapter 6 (commencing with Section 1367) of Title 10 of Part 2." (§ 4019, subd. (a)(8), added by Stats. 2021, ch. 599, § 3.0, italics added.)

The plain meaning of this provision is that, as of January 1, 2022, defendants undergoing treatment for incompetence in a state hospital are eligible for section 4019 conduct credit on the same terms as those confined to county jails. As stated in the

15

Legislative Counsel's Digest for Senate Bill 317,[7] the bill "extend[s] the application of conduct credits to persons confined in a state hospital or other mental health treatment facility pending their return of mental competency." (Legis. Counsel's Dig., Sen. Bill No. 317 (2021–2022 Reg. Sess.) Stats. 2021, ch. 599.)

Having set out the statutory context, we now turn to Orellana's arguments that the trial court erred by failing to award him conduct credit under section 4019 for the time he was undergoing restoration to competence in the state hospital. We first examine whether Senate Bill 317 applies retroactively to Orellana for, if it does, then Orellana is entitled to these credits as a matter of statute, and we need not reach his constitutional claims.

### a. Retroactivity of Senate Bill 317

Penal statutes are generally presumed to apply prospectively unless they expressly state otherwise. (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287; § 3.) Neither party contends that Senate Bill 317 contains any express declaration that conduct credits for individuals being restored to competence in the state hospital are to be awarded retroactively or that any clear and unavoidable implication to that effect arises from the relevant extrinsic sources, such as the legislative history. Therefore, Senate Bill 317 does not expressly address whether it applies retroactively.

Nevertheless, under *Estrada*, "an amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date." (*People v. Floyd* (2003) 31 Cal.4th 179, 184, citing *In re Estrada* (1965) 63 Cal.2d 740, 744 (*Estrada*).) *Estrada* thus presents "an important, contextually specific qualification to the ordinary presumption that statutes operate

---

[7] The bill summaries provided by the Legislative Counsel's Digest, printed as a preface to every bill considered by the Legislature, are not binding but "are entitled to great weight." (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1169–1170.)

prospectively." (*Brown*, *supra*, 54 Cal.4th at p. 323.) "Whether a statute operates prospectively or retroactively is, at least in the first instance, a matter of legislative intent. When the Legislature has not made its intent on the matter clear with respect to a particular statute, the Legislature's generally applicable declaration in section 3 provides the default rule: 'No part of [the Penal Code] is retroactive, unless expressly so declared.' " (*Id.* at p. 319.)

The parties dispute the relevance of Senate Bill 317 to this appeal. Orellana contends that the new law applies to his case under *Estrada* as an ameliorative statute intended to address an unfairness in the awarding of conduct credits. The Attorney General argues it does not, citing the California Supreme Court's decision in *Brown, supra*, 54 Cal.4th 314, which addressed a prior modification to section 4019.

In *Brown*, the Supreme Court considered whether a former version of section 4019 that increased the rate at which local prisoners could earn conduct credits applied retroactively to benefit prisoners who served time in custody before the date on which the former statute became operative. (*Brown*, *supra*, 54 Cal.4th at pp. 317–318.) After concluding that neither the terms of the former statute nor any part of its legislative history supported a determination that increased conduct credits were to be awarded retroactively (*id.* at p. 320), the court examined whether the rule of *Estrada* required retroactive application of the former statute providing increased conduct credits. (*Id.* at p. 323.)

The California Supreme Court answered in the negative. It wrote, "This brings us to the question whether the rule of *Estrada*, *supra*, 63 Cal.2d 740, requires us to apply retroactively a statute increasing the rate at which prisoners may earn credit for good behavior. The question can properly be answered only in the negative. The holding in *Estrada* was founded on the premise that ' "[a] legislative mitigation of the penalty *for a particular crime* represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law" ' (*Estrada*, at

17

p. 745, italics added) and the corollary inference that the Legislature intended the lesser penalty to apply to crimes already committed.  In contrast, a statute increasing the rate at which prisoners may earn credits for good behavior does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent.  . . .  [A] prisoner who earns no conduct credits serves the full sentence originally imposed.  Instead of addressing punishment for past criminal conduct, the statute addresses *future conduct* in a custodial setting by providing increased incentives for good behavior." (*Brown*, *supra*, 54 Cal.4th at p. 325, fn. omitted.)

Moreover, the court in *Brown* squarely rejected the argument advanced here by Orellana that courts should infer legislative intent of retroactive application from a statute that equalizes credits among different groups of defendants.  The court stated, "Defendant suggests the Legislature's desire to reduce punishment through former section 4019 can be inferred from its intent to equalize the credit-earning ability of state and local prisoners.  [Citation.]  As noted above, we do not take issue with the proposition that to increase credits reduces punishment.  The question is whether such a law falls within the rule of *Estrada*, *supra*, 63 Cal.2d 740.  It does not, as we have explained.  Furthermore, to recognize the Legislature wished to equalize credits does not, by itself, provide a logical basis for inferring the Legislature wished to do so *retroactively*." (*Brown*, *supra*, 54 Cal.4th at p. 325, fn. 15.)

We recognize that the California Supreme Court in recent years has expanded the scope of *Estrada* beyond the somewhat limited terrain described in *Brown*.[8]  However,

_____

[8] For example, the court recently observed that it has "applied *Estrada*'s inference of retroactivity to statutes governing penalty enhancements, as well as statutes governing substantive offenses" (*People v. Frahs* (2020) 9 Cal.5th 618, 628) and, significantly, has "applied the *Estrada* rule to statutes that merely made a reduced punishment *possible*." (*Id.* at p. 629.)  Notably, our high court has applied the *Estrada* rule "to an amendatory act that 'ameliorated the possible punishment for a *class of persons*' " even though the

18

the California Supreme Court continues to cite *Brown* with approval when describing the principles of retroactivity. The court recently observed that the applicability of *Estrada* depends on whether a change in law is ameliorative and among its precedents on that question referenced *Brown*. It described the opinion as standing for the proposition that a "change to accrual of good behavior credits incentivized future conduct rather than altering the penalty for a crime, and thus did not ameliorate punishment in the relevant sense." (*People v. Esquivel* (2021) 11 Cal.5th 671, 676.)

*Brown* thus remains authoritative, and we conclude it is controlling here. "The Legislature, of course, is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof." (*People v. Harrison* (1989) 48 Cal.3d 321, 329.) As in *Brown*, the language of Senate Bill 317 and relevant legislative history provide no indication of retroactive intent. (See *Brown*, *supra*, 54 Cal.4th at p. 320.) Also, similar to *Brown*, the statutory amendment does not mitigate or lessen the penalty for a particular crime or offense but rather facilitates the accrual of conduct credits by extending section 4019 to a group previously excluded from its provisions.[9]

_____

effect was not to mitigate punishment for any particular crime. (*Ibid.*, quoting *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308.)

[9] Orellana asserts that the Supreme Court has acknowledged that an increase in conduct credits amounts to a decrease in punishment (which, in Orellana's view, triggers the *Estrada* presumption). (See *People v. Lara* (2012) 54 Cal.4th 896, 905–906 [accepting the proposition "that a person who is released a day early is punished a day less"]; and noting *id.* at p. 906 ["[t]he very purpose of conduct credits is to foster constructive behavior in prison by reducing punishment"].) Indeed, as noted *ante*, the court made the same observation in *Brown*. (See *Brown*, *supra*, 54 Cal.4th at p. 325.) While Orellana is correct that the California Supreme Court in both *People v. Lara* and *Brown* recognized that increasing the rate of conduct credit accrual or expanding eligibility effectively reduces punishment, the court in *Brown* expressly declined to extend the logic of *Estrada* on this basis to a law that rewards good behavior in prison. (*Brown*, at p. 325, fn. 15.) The language Orellana relies upon in *People v. Lara* is therefore merely dicta and does not abrogate *Brown*'s authoritative analysis of section 4019.

Orellana contends that *Brown* is distinguishable because instead of increasing the rate of the conduct credit award—a result the Supreme Court interpreted was intended to serve as a forward-looking incentive to encourage good behavior (*Brown*, *supra*, 54 Cal.4th at p. 325)—Senate Bill 317 is "plainly intended to address an *unfairness* in the recent *prior* amendment to section 4019 [i.e., Senate Bill 1187]." He suggests that the present situation is more akin to *In re Kapperman* (1974) 11 Cal.3d 542 (*Kapperman*) and *People v. Sage* (1980) 26 Cal.3d 498 (*Sage*).[10] We disagree.

Orellana's argument overlooks a distinction the California Supreme Court deemed critical in *Brown*—that between custody credits and conduct credits. As the court stated in *Brown*, citing *Kapperman* as one example, "[c]ases involving *custody* credit—credit for time served [citations]—may properly be distinguished as irrelevant." (*Brown*, *supra*, 54 Cal.4th at p. 326.) The court noted the behavioral incentive associated with conduct credits was critical to this distinction: "Credit for time served is given without regard to behavior, and thus does not implicate the distinction between statutes that provide behavioral incentives (e.g., conduct credits) and statutes that 'mitigat[e] . . . the penalty

---

[10] In *Sage*, the California Supreme Court considered in relevant part whether the version of section 4019 then in effect, which authorized presentence conduct credit for misdemeanants who ultimately served their sentences in county jail but not for felons confined in jail while awaiting trial, denied the defendant—who was a felon—equal protection of the laws. (*Sage*, *supra*, 26 Cal.3d at pp. 504, 506–507.) In analyzing the grounds advanced for the distinction, the court uncovered no "rational basis for, much less a compelling state interest in, denying presentence conduct credit to detainee/felons" (*id.* at p. 508) and held that the statute's differential treatment of felons and misdemeanants for the purpose of presentence conduct credits violated equal protection. (*Ibid.*)

In *Kapperman*, the California Supreme Court considered the constitutionality of an expressly prospective statute that granted credit to felons for time served in local custody before sentencing and commitment to state prison. (*Kapperman*, *supra*, 11 Cal.3d at pp. 544–545.) The court concluded that equal protection required the retroactive application of the statute to "eliminate the discriminatory classification . . . and thus extend the statutory benefits retroactively to those whom the Legislature improperly excluded." (*Id.* at p. 545.)

for a particular crime' (*Estrada*, *supra*, 63 Cal.2d 740, 745)." (*Brown*, at p. 326.) *Brown*'s analysis of retroactivity and equal protection (which we explore further below) thus rested on the fundamental premise that section 4019 provides behavioral incentives to detainees to affect their *future* behavior.

In denying the retroactive applicability of the changes to section 4019 examined in *Brown*, the court relied on a prior decision, *In re Strick* (1983) 148 Cal.App.3d 906 (*Strick*). The *Brown* court described *Strick* as "a case that, while ultimately decided under the equal protection clause, necessarily examined the legislative purpose underlying conduct credits and concluded that statutes authorizing such credits must logically apply prospectively." (*Brown*, *supra*, 54 Cal.4th at p. 327.) *Brown* quoted *Strick* for the proposition that the " 'obvious purpose' " of offering conduct credits " 'is to affect the behavior of inmates by providing them with incentives to engage in productive work and maintain good conduct while they are in prison . . . [¶] It is fair to observe that this incentive purpose has no meaning if an inmate is unaware of it. The very concept demands prospective application. "Reason dictates that it is impossible to influence behavior after it has occurred." ' " (*Brown*, at p. 327, quoting *Strick*, at p. 913.)[11] Although Orellana contends here that the purpose of Senate Bill 317 is to address an unfairness in affording conduct credits to individuals undergoing restoration to competence in local jails (as effected by Senate Bill 1187) but not those in state hospitals, the legislative histories of Senate Bill 1187 and Senate Bill 317 demonstrate that the intent of both statutes was to provide individuals undergoing restoration to competence the same good conduct incentives afforded to other detainees.

---

[11] In adopting the reasoning of *Strick*, the California Supreme Court in *Brown* furthermore declined to embrace the retroactive aspect of the holding in *Sage*, characterizing it merely as a "practical effect" of the decision (*Brown*, *supra*, 54 Cal.4th at p. 329), which from an analytical standpoint, failed to address the argument that "conduct credits, by their nature, must apply prospectively to motivate good behavior." (*Id.* at p. 330.)

21

For example, the June 18, 2018, Assembly Committee on Public Safety's bill summary states that Senate Bill 1187 "[r]educes the maximum term for commitment to a treatment facility when a defendant has been found incompetent to stand trial (IST)" and "[s]pecifies that when a defendant has been found IST and is held in a county jail treatment center while undergoing treatment for restoration for competency, that person is entitled to custody credits *in the same manner as any other inmate confined to a county jail*." (Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 1187 (2017-2018 Reg. Sess.) June 18, 2018, p. 1, italics added.)

The June 18, 2018 Assembly Committee analysis explained that Senate Bill 1187 "would ensure that an individual that has been found IST and continues to be held and treated in a county jail, *earns credits in the same manner* and at the same rate as an individual in a county jail that is not IST." (Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 1187 (2017-2018 Reg. Sess.) June 18, 2018, p. 5, italics added.) Or, as stated in an earlier Senate Committee on Public Safety analysis, Senate Bill 1187 "mandates *equal credits-earning* by committed incompetent persons who are detained in county jail facilities." (Sen. Com. on Pub. Safety, Analysis of Sen. Bill No. 1187 (2017-2018 Reg. Sess.) Mar. 19, 2018, p. 5, italics added.)

The summary of Senate Bill 317 by the author similarly states, " 'SB 317 ensures incompetent defendants are eligible for the same time served *credit for good conduct* as their competent counterparts, while receiving treatment in any treatment facility or as an outpatient, not just a county jail treatment.' " (Sen. Bill No. 317, 3d reading Sept. 1, 2021, Assem. Floor Analysis (2021-2022 Reg. Sess.) pp. 1–2, italics added.)

Section 4019, at issue here, operates in the same manner it did when the California Supreme Court examined it in *Brown*. There, as just discussed, the court concluded that because the amendment to section 4019 addressed forward-looking conduct incentives, it would not presume the Legislature intended the amendment to apply retroactively and therefore *Estrada* did not apply. Because the *Brown* analysis squarely applies here, we

22

reach the same conclusion. We hold that Senate Bill 317 does not apply retroactively to Orellana, who had completed his restoration to competence in the state hospital long before enactment of this legislation.

### 2. Equal Protection Principles and Analysis

Our analysis does not end with the determination that Senate Bill 317 applies only prospectively. Orellana asserts, independent of his *Estrada* claim for retroactive application of the statute, that the passage of Senate Bill 317 provides irrefutable support for his equal protection claim. He contends that by righting the disparity in entitlement to section 4019 conduct credits that remained under Senate Bill 1187, Senate Bill 317 upended the notion that there was any rational basis, let alone compelling state interest,[12] for withholding conduct credits from inmates who receive competency treatment in state hospitals while allowing credits to be earned by their county jail facility counterparts. Thus, Orellana argues this court is constitutionally compelled to award 48 additional days of conduct credit such as he would have been entitled to receive had his competency treatment in the state hospital occurred after Senate Bill 317 took effect.

We analyze the equal protection guarantees of the Fourteenth Amendment and the California Constitution, which are substantially equivalent, in a similar fashion. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a); *People v. Leng* (1999) 71 Cal.App.4th 1, 11.) "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally." (*Brown*, *supra*, 54 Cal.4th at p. 328.) " ' "[T]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." ' [Citation.]

---

[12] The parties here disagree as to the applicable level of scrutiny. However, we need not address—and express no opinion—as to what level of judicial scrutiny applies. We instead conclude Orellana's equal protection claim fails at the threshold issue of whether the two groups are similarly situated. (See *Brown*, *supra*, 54 Cal.4th at p. 328.)

'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' " (*Ibid.*, italics omitted.) For reasons similar to the retroactivity analysis set out above, we decide the California Supreme Court's decision in *Brown* forecloses Orellana's equal protection challenge.

The California Supreme Court in *Brown* rejected an equal protection challenge to the denial of custody credits at the increased rate under review for individuals who had served their time before enactment of the changes to section 4019 at issue there. Just as with retroactivity, the forward-looking incentive of custody credits was the decisive factor. The court in *Brown* held that individuals who had already been sentenced were not similarly situated to those who were in custody after the new legislation entered into force.

The court stated, "As we have already explained, the important correctional purposes of a statute authorizing incentives for good behavior [citation] are not served by rewarding prisoners who served time before the incentives took effect and thus could not have modified their behavior in response. That prisoners who served time before and after former section 4019 took effect are not similarly situated necessarily follows." (*Brown*, *supra*, 54 Cal.4th at pp. 328–329.) On this point, the high court again cited with approval the decision in *Strick*. In particular, the Supreme Court found persuasive the Court of Appeal's reasoning which "rejected the claim that an expressly prospective law increasing conduct credits violated equal protection unless applied retroactively to prisoners who had previously earned conduct credits at a lower rate." (*Brown*, at p. 329.) The Supreme Court in *Brown* reiterated the incentive purpose of good conduct credits and adopted the Court of Appeal's conclusion in *Strick* that given the prospective operation of conduct credits, " 'inmates were only similarly situated with respect to the purpose of the [new law] on [its effective date], when they were all aware that it was in

24

effect and could choose to modify their behavior accordingly.' " (*Id.* at p. 329, quoting *Strick*, *supra*, 148 Cal.App.3d at p. 913.)

The California Supreme Court in *Brown* also expressly distinguished the decisions in *Sage*, *supra*, 26 Cal.3d 498 and *Kapperman*, *supra*, 11 Cal.3d 542 (on which Orellana relies in this appeal) in reaching its conclusion that detainees who had already served their custodial time before the statute went into effect were not similarly situated to current detainees. As described above, *Kapperman* involved an equal protection challenge to custody—not conduct credits—and therefore was inapplicable. "Credit for time served is given without regard to behavior, and thus does not entail the paradoxical consequences of applying retroactively a statute intended to create incentives for good behavior. *Kapperman* does not hold or suggest that prisoners serving time before and after the effective date of a statute authorizing *conduct* credits are similarly situated." (*Brown*, *supra*, 54 Cal.4th at p. 330.) The court in *Brown* rejected the relevance of *Sage* because the court in the latter case did not consider that "conduct credits, by their nature, must apply prospectively to motivate good behavior." (*Ibid*.) "As cases are not authority for propositions not considered [citation], we decline to read *Sage* for more than it expressly holds." (*Ibid*.)

We recognize that Orellana frames his equal protection argument differently from the analysis in *Brown*. He focuses not on any temporal distinction between defendants who received competency treatment in state hospitals prior to and after the passage of legislation extending conduct credits to that group, but instead on the purported absence of any rational basis for distinguishing between defendants whose treatment for restoration to competence takes place in county jails versus state hospitals. Orellana's comparison framework might be persuasive were we writing on a clean slate. However, the Supreme Court's articulation in *Brown* of the operation of section 4019 conduct credits as an incentive to promote good conduct in custody is determinative here. We see nothing in the text of Senate Bill 317 or Senate Bill 1187 or the relevant legislative

25

history that suggests the Legislature rejected the forward-looking nature of the incentive structure of section 4019 articulated by the Supreme Court in *Brown*.

Under *Brown*, entitlement to conduct credits is directed at "*future conduct* in a custodial setting" (*Brown*, *supra*, 54 Cal.4th at p. 325) and effectively precludes the court from deeming two groups similarly situated for purposes of earning conduct credits when the time in custody preceded the availability of incentive based credits. (*Id.* at pp. 325–328.) We therefore decline to adopt Orellana's position that, as a practical matter, presentence conduct credits are awarded in full unless the prosecution or probation authorities takes steps to reduce or eliminate the credits award. Instead, we conclude the Supreme Court's analysis of any constitutional basis for extending entitlement to section 4019 conduct credits controls our analysis.

Orellana urges that given the changes under Senate Bill 317, this court should apply a similar analysis to that in *Yanez*, in which the court upheld an equal protection challenge to differential access to conduct credit for pretrial versus posttrial time spent in home detention under electronic monitoring. (*Yanez*, *supra*, 42 Cal.App.5th at p. 93.) However, *Yanez* did not analyze *Brown* in any detail and expressly decided that the Attorney General had waived any argument about retroactivity. The court stated, "we note that the People do not argue that pretrial conduct credits could not be applied retroactively to Yanez's sentence in any event, even if an equal protection violation were demonstrated. As that question is not before us, we deem it waived for purposes of this appeal and express no opinion as to the propriety of deeming an appellant retroactively eligible for conduct credits on the basis of an equal protection violation and assume for purposes here that such a disposition is warranted." (*Id*. at p. 101.) Given this caveat, *Yanez* does not assist Orellana. Furthermore, inasmuch as the California Supreme Court's opinion in *Brown* addresses questions closely analogous to those presented here, we are bound to follow its dictates. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

26

Here, as in *Brown*, the statutory amendment at issue operates prospectively, as decided *ante*. For purposes of assessing whether that prospective application offends equal protection, we discern no practical difference between the expansion of conduct credits under section 4019 to a previously excluded class of persons—as has occurred in this case pursuant to Senate Bill 317—and eligibility to earn conduct credits at an increased rate, as was at issue in *Brown*. In both cases, the purpose of the new provision " 'is to affect the behavior of inmates by providing them with incentives to engage in productive work and maintain good conduct while they are in prison.' [Citation.] '[T]his incentive purpose has no meaning if an inmate is unaware of it. The very concept demands prospective application.' " (*Brown*, *supra*, 54 Cal.4th at p. 329.) Since Orellana is not similarly situated to inmates to whom Senate Bill 317 statutorily applies, denial of conduct credits to him does not violate his right to equal protection of the laws.

### III.  DISPOSITION

The judgment is affirmed.

_____
                    Danner, J.

WE CONCUR:


_____
Greenwood, P.J.




_____
Wilson, J.




**H048315**
*People v. Orellana*

Trial Court:    County of Monterey

Trial Judge:    Hon. Rafael Vazquez

Counsel:    William Robinson, by appointment of the Court of Appeal under the Sixth District Appellate Program, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney, René Chacon, Supervising Deputy Attorney General, Bruce Ortega, Deputy Attorney General for Plaintiff and Respondent.

**H048315**
*People v. Orellana*